**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| CARMEN DANIELLE MORA SANCHEZ, on behalf of herself and all others similarly situated, <br><br>     Plaintiff, <br><br> v. <br><br> STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, and HIDAY & RICKE, P.A., <br><br>     Defendants. <br> _____/ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     CLASS REPRESENTATION <br><br>    Civil Action No.: _____ |

## CLASS ACTION COMPLAINT

**I.  Parties to this Complaint**

1.     Plaintiff CARMEN DANIELLE MORA SANCHEZ (referred to individually as "Plaintiff") is a resident of Volusia County, Florida and was a resident of Volusia County, Florida at all times material to this action.

2.     Plaintiff asserts these claims individually and on behalf of all individuals similarly situated ("Plaintiffs").

3.     Defendant STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY (referred to individually as "State Farm") is an Illinois corporation registered to do business in the State of Florida.

1

4.      State Farm is one of the largest automobile insurance companies in Florida.

5.      Defendant HIDAY & RICKE, P.A. (referred to individually as "Hiday & Ricke") is a Florida professional association, with its principal address at 4100 Southpoint Drive East, Ste. 3, Jacksonville, Florida 32216.

6.      Hiday & Ricke markets itself as a premier subrogation debt collection firm for America's best-known insurance companies throughout Florida specializing in all types of subrogation matters including the collection of property damage claims.

7.      An agreement exists between State Farm and Hiday & Ricke (herein referred to jointly as "Defendants") such that an association in fact exists between them for the purposes of enforcing State Farm's subrogation rights and for the purpose of debt collections on behalf of State Farm.

8.      Hiday & Ricke has a pecuniary interest to collect the highest settlements or debt collections on behalf of State Farm.

9.      Specifically, the more money that Hiday & Ricke collects on behalf of State Farm from State Farm's judgment debtors, the more money that Hiday & Ricke collects as a commission or bonus for itself.

10.     Plaintiff is a judgment debtor to State Farm Mutual Automobile Insurance Company as a result of a 2015 automobile accident.

## II.  Statement of Jurisdiction

11.    This action arises under Chapter 96 of the United States Code, more commonly known as the Racketeer Influenced and Corrupt Organizations Act (herein abbreviated as the "RICO Act").

12.    Pursuant to 18 U.S.C. § 1964(a), this Court has original jurisdiction over this action.

13.    Pursuant to 28 U.S.C. §§ 1391(b)(1) – (2), venue is proper in the Middle District of Florida, Jacksonville Division.

14.    This is not your typical debt collection case.  Here, State Farm and its lawyers routinely use the Florida Department of Highway Safety and Motor Vehicles (the "DMV") to wrongfully suspend driving privileges of Florida drivers who had the statutory minimum amount of insurance, but still owe money to State Farm because an auto accident left a balance owed after insurance paid its share. Defendants wrongfully request that the DMV revoke the driver's license of these individuals as a means to extort money from them towards their judgment debt. Furthermore, Defendants fail to disclose to the DMV that the debtor had the required amount of insurance knowing that withholding this information will result in an automatic suspension.  Thereafter, Defendants hold the debtor's suspended license over them to force them to make additional payments in order for State Farm to allow them to drive again.  In essence, Defendants misuse and manipulate the limited

statutory procedure to cause the DMV to suspend licenses of Florida drivers without valid justification so that State Farm and its lawyers can extort money towards their judgment debts.  Such conduct violates the Federal RICO Act and constitutes an abuse of process under Florida state law.

15.    First, in 1955 the Florida Legislature passed Chapter 324 of Florida Statutes to "show proof of financial ability to respond for damages" by setting a minimum amount of insurance that all drivers must carry.  Fla. Stat. § 324.011. Section 324.021(7) requires that every Florida driver must obtain "Proof of Financial Responsibility" to respond to damages if an accident occurs by having coverage in the amount of $10,000 for bodily injury to one person, $20,000 for bodily injury to two or more persons, and $10,000 for property damage.  Fla. Stat. § 324.021(7). For purposes of this Complaint, the "10/20/10" insurance requirement is identified as the "statutory minimum" amount of insurance coverage required by the State.

16.    Second, the Legislature included provisions for revoking one's driver's license if the driver is ticketed or in a crash without having the statutory minimum amount of insurance.  Fla. Stat. § 324.051(b)(1).

17.    Third, if a judgment is entered against a driver who did not have the statutory minimum amount of insurance, the Legislature approved the suspension of that person's license and registration.  Fla. Stat. § 324.121.  However, the suspension provided by § 324.121 is NOT automatic.  Instead, the judgment creditor (like State

4

Farm here) is permitted to "request" that the clerk send a copy of the unpaid judgment to the DMV for the specific purpose of suspending that judgment debtor's license and registration. Fla. Stat. § 324.111. The reason that the judgment and suspension is not automatically sent is because only those judgments resulting from a failure to carry the required amount of insurance should be sent to the DMV. If the driver carried the required insurance, there is no reason to suspend their license regardless of whether the accident resulted in a judgment debt.

18.    Critical to the claims made here, the duration of an unpaid judgment suspension is only until the judgment creditor pays up to the statutory minimum limits. Fla. Stat. § 324.131. The Period of Suspension statute states, in pertinent part as follow:

> Period of suspension. Such license, registration and nonresident's operating privilege shall remain so suspended and shall not be renewed, nor shall any such license or registration be thereafter issued in the name of such person, including any such person not previously licensed, unless and until every such judgment is stayed, satisfied in full or to the extent of the limits stated in s. 324.021(7) and until the said person gives proof of financial responsibility as provided in s. 324.031, such proof to be maintained for 3 years.

Fla. Stat. § 324.131.

19.    In other words, the suspension of a license for an unpaid judgment is ONLY to last until it has either been paid in full OR it has been paid up to the statutory 10/20/10 minimum amounts. *Id.* If the debtor always had the required

insurance, the "duration" of the suspension should be zero because the limits of the policy would have been paid. This statutory structure is designed to ensure that Florida drivers who obtained the requisite minimum amount of insurance will never have their license suspended despite an unpaid judgment balance because (1) they had Proof of Financial Responsibility at the time of the accident, and (2) their insurance policy will have paid the judgment up to the statutory limit. It would make no sense for the State to suspend driving privileges for those who followed the law and obtained the statutorily required amount of insurance. The State does not punish those who follow its rules and the State does not act as a debt collector on balances that may remain over and above the amounts paid by insurance.

20.    Back in 1958, shortly after these statutes were first passed, the Florida Attorney General was asked to interpret the above statutory scheme in precisely this manner:

> QUESTIONS:
> When a person furnishes satisfactory evidence of being properly insured at the time he was involved in a motor vehicle accident can his driving and registration privileges be suspended thereafter under §324.121, F.S., if a judgment rendered against him as a result of the accident in an amount in excess of the $10/20/5 limits of liability required by §324.021(7), F.S.?
>
> ***
>
> AS TO QUESTION 1:

> Section 324.121, F.S., provides that the insurance commissioner shall, upon receipt of a certified copy of a 'judgment,' suspend the license and registration of the person against whom the judgment was rendered. ('Judgment' is defined in §324.021(10), F.S.). Section 324.131, F.S., provides that the license and registration shall remain suspended until the 'judgment is stayed, satisfied in full or to the extent of the limits stated in §324.021(7), …' **If a person is properly insured, his insurance will satisfy the judgment to the extent of the limits provided in §324.021(7), F.S. Accordingly, your 1st question is answered in the negative.**

See Exhibit 1, Fla. Op. Atty. Gen., 058-320, Dec. 3, 1958 (emphasis added).

21. By answering Question 1 in the "negative," the Attorney General confirmed that the driving privileges of a properly insured judgment debtor should not ever be suspended. *Id.* Despite this long-held directive from the Attorney General, insurance companies like State Farm and its counsel routinely threaten Florida drivers with license suspensions despite the driver having the statutory minimum amount of auto insurance. Even after State Farm accepts payment from the driver's insurance company paying the full policy limits, State Farm and its lawyers, Hiday & Ricke, threaten to have the driving privileges of the judgment debtors revoked by the State, and if payment is not made they follow through and use the DMV to suspend the driving privileges of hundreds of properly insured Florida drivers every year. Essentially, they improperly use the DMV as a collection tool to force payments of judgment debtors.

22.    That is what State Farm and its lawyers did to Plaintiff when they requested that the DMV suspend her license and driving privileges despite knowing that she had the statutory minimum insurance and despite her insurance company already paying that limit to State Farm.  This common course of conduct constitutes racketeering activities in violation of the RICO Act and also constitutes an abuse of process claim under Florida common law.

**III.  Factual Background**

23.    On October 30, 2015, Plaintiff operated a motor vehicle that collided into a vehicle insured by State Farm.

24.    At the time of the crash, Plaintiff was insured by a contract of insurance with Progressive Insurance Company that provided coverage in the amounts of the required 10/20/10 minimum insurance requirements under Florida law.

25.    Plaintiff's insurance company provided Defendants with the necessary insurance disclosures establishing that, at the time of the crash, Plaintiff was properly insured to the 10/20/10 minimum insurance requirements by Progressive.

26.    The property damage caused to the motor vehicle insured by State Farm exceeded $10,000.00.

27.    Thus, Plaintiff's $10,000.00 property damage limit of liability was insufficient to satisfy the full amount of property damages to the vehicle insured by State Farm.

8

28.     State Farm paid for the damages to its insured's vehicle with the intent of enforcing its right of subrogation against Plaintiff.

29.     State Farm hired Hiday & Ricke, PA to file a subrogation lawsuit against Plaintiff seeking damages in the amount of $16,257.98 — the amount of property damages paid by State Farm to repair its insured's vehicle.

30.     During the discovery phase of the subrogation lawsuit, Plaintiff again provided proof to Defendants that she was insured at the time of the crash to the extent of the 10/20/10 minimum insurance requirements.

31.     On March 9, 2018, a mediation occurred between Plaintiff and State Farm, whereby the parties entered into a settlement agreement.

32.     Pursuant to the agreement, Plaintiff's insurer, Progressive Insurance Company, paid the full limit of the $10,000.00 in property damage coverage available under Plaintiff's policy.

33.     In addition to the $10,000.00 paid by Plaintiff's insurance company, Plaintiff agreed to personally pay an additional $4,000.00 to Defendants over a period of time and in monthly payments.

34.     Because Plaintiff had a Progressive auto insurance policy at the time of the accident which included the statutory minimum amount of $10,000.00 in property damage coverage, Plaintiff was never subject to having her driving privileges suspended pursuant to Fla. Stat. § 324.111.

9

35.    As a Florida licensed auto insurance company, State Farm and its counsel knows and fully understands the statutory minimum amounts of insurance required by Florida law.  And they know that there is no lawful basis for seeking to revoke a judgment debtors' driving privileges if they carried the required amount of insurance at the time of the accident.

36.    Plaintiff was financially unable to make the monthly payments as planned and she defaulted under the settlement agreement in January 2019.

37.    Pursuant to the settlement agreement, Hiday & Ricke obtained a judgment from the trial court on behalf of State Farm on February 6, 2019, in the amount of $5,803.92.  This amount did not include the $10,000 that had previously been paid by Progressive on Plaintiff's behalf.  Because Hiday & Ricke had filed the original suit and collected the $10,000 in property damage coverage under Plaintiff's Progressive policy, it possessed actual knowledge that Plaintiff had the statutory amount of insurance require by Florida law.

38.    On April 12, 2019, Hiday & Ricke, sent Plaintiff a "warning letter" threatening to "notify the State of [the unpaid judgment] and request that they suspend [her] driving and registration privileges."  (Exhibit 2).

39.    The letter additionally threatened in large, boldface print that Plaintiff must "[c]ontact [Hiday & Ricke] immediately . . . to avoid suspension of [her] license." (Exhibit 2).

40.    This direct threat by Hiday & Ricke to have the DMV suspend Plaintiff's driving privileges if she failed to make payment was without any lawful justification.   Specifically, it was the intent of Hiday & Ricke to obtain money from Plaintiff by threating to have her driving privileges suspended despite the fact that there was no legal basis to initiate or seek a suspension of Plaintiff's driving privileges because she had the requisite minimum amount of insurance required by Florida law at the time of the accident.

41.    Further, Hiday & Ricke knew that they had no legal authority or right to seek or initiate a suspension of Plaintiff's driving privileges because she had the required minimum insurance.  However, Defendants also knew that a suspension would automatically issue as long as Defendants did not disclose to the DMV the material fact that Plaintiff carried the required minimum amount of insurance at the time of the accident.  As a result, Defendants knowingly and intentionally concealed from the DMV the fact that Plaintiff had the required minimum amount of insurance when they notified the DMV of Plaintiff's unpaid judgment balance.  In fact, the entire purpose of contacting the DMV, as their Warning Letter advised, was to have Plaintiff's driving privileges revoked.  Defendants knew that Plaintiff's driving privileges would not be revoked if they informed the DMV the truth - that Plaintiff had the required insurance.  Accordingly, the omission of this information was a knowing and intentional action by Defendants that was intended to deceive the DMV

with the intent of causing harm to Plaintiff through the revocation of her driving privileges.

42.    Defendants' interest in making these threats is to further their own pecuniary objectives by collecting the most money from Plaintiff and others similarly situated by misstating the law and deceiving the DMV and having the driving privileges of its judgment debtors suspended without good cause.

43.    Defendants committed mail or wire fraud by knowingly and intentionally deceiving the DMV by omitting the material fact that Plaintiff had the statutorily required minimum insurance knowing that the Department would automatically revoke Plaintiff's license without further inquiry.  Defendants made this material omission with the intent that the state of Florida Department of Motor Vehicles rely on their notice to revoke Plaintiff's driving privileges without additional inquiry.

44.    Hiday & Ricke's threat to revoke the driving privileges of Plaintiff and the class was without any lawful justification because Plaintiff and others similarly situated had the required amount of insurance and her insurance company had already paid $10,000.00 to Defendants.  Both State Farm and Hiday & Ricke knew that Plaintiff was lawfully insured but still threatened a suspension of Plaintiff's driving privileges anyway, which constitutes a deliberate abuse of process.

45.    True to their word, when Plaintiff was unable to pay as commanded, Hiday & Ricke abused the statutory process for revoking driving privileges of uninsured drivers pursuant to § 324.111, with the full knowledge and expectation that the Department would automatically suspend her driving privileges despite the fact that Defendants knew that Plaintiff had the minimum amount of auto insurance and had even accepted payment under that policy.

46.    On April 22, 2019, Plaintiff received correspondence from the Florida DMV advising that her driver's license was suspended "for not satisfying a civil court judgment. . . . as a result of the traffic crash on October 30, 2015."

47.    Plaintiff, through counsel, contacted Hiday & Ricke to advise of the illegal and improper suspension of her license and demanded that Plaintiff's driving privileges be immediately reinstated by and through Defendants' revocation of its request for suspension.

48.    Despite being provided a clear legal analysis of why the suspension was illegal—including a copy of the Attorney General Opinion on the exact issue—Hiday & Ricke still refused to assist in the reinstatement of Plaintiff's driving privileges.

49.    By email dated May 3, 2019, Hiday & Ricke stated, inter alia, the following:

> We have reviewed this at length and have made a determination that it is up to the DMV whether or not they can or cannot suspend the license.

All we can do is request it based on 324.11 and 324.121.  But the [Plaintiff] then ha[s] the option and the ability to have [her] license reinstated by the DMV by establishing that the required insurance was in place and the amount of the required insurance has been paid.  It is the responsibility of the [Plaintiff] to go to the DMV and do this and the decision is the decision of the DMV. (Exhibit 3).

50.    Accordingly, Hiday & Ricke conceded that it knew Plaintiff was properly insured at the time it sought to have her driving privileges revoked by the DMV.  While the DMV may have the ability to reinstate the license, Defendants never should have sought to have those privileges revoked and they engaged in an abuse of process by making such requests.  The purpose is only to abuse and harass Plaintiff and others similarly situated.

51.    Plaintiff's driving privileges remained suspended for several weeks, until about May 8, 2019, when Plaintiff, by counsel, contacted the Department telephonically to advise of the illegal suspension and demanded immediate reinstatement of Plaintiff's driving privileges.

52.    By letter dated May 9, 2019, the Department advised Plaintiff that her driving privileges had been reinstated and "regret[ted] any inconvenience" caused to her by the improper suspension.

53.    As a result of her suspended driving privileges, Plaintiff—a single mother of two—was terminated from her job as an elder-care provider because she was unable to drive clients to their various appointments which was an integral part

of her job.  At that time, Plaintiff earned approximately $350.00 per week.  It took her several weeks to find other work.

54.    During the time that her license was suspended, Plaintiff was forced to incur unnecessary expenses for private and third-party transportation so as to avoid criminal charges for driving with a suspended license.  Plaintiff also feared losing her license for a longer period of time and not being able to obtain employment if she had her license revoked for driving on a suspended license.  Between April 22, 2019 and May 9, 2019, Plaintiff relied on Uber for rides approximately 25 times at an average rate of $14.00 per trip.  These out of pocket damages would not have been incurred but for Plaintiff's license being improperly suspended through the actions of Defendants.

55.    Many class members are not as lucky as Plaintiff and have to pay to have their license reinstated, if at all.  Defendants seek suspension despite full knowledge that the debtor had the required insurance for the purpose of harassing and threatening the debtor.  These are not the intent of the statutes at issue and using the DMV in this manner constitutes and abuse of process.

56.    Plaintiff seeks an injunction from this Court preventing the RICO scheme utilized by Defendants to prey on the underprivileged and to improperly and knowingly omit material information from its Notices to the Department with the

intent that the Department automatically suspend the driving privileges of Florida drivers without lawful justification.

57.     The damage caused to Plaintiff and members of the class by losing their driving privileges is abhorrent, unjust and must be stopped.  Plaintiff and members of the class incur damages including out of pocket costs, reinstatement fees, and other damages, including nominal damages.

58.     Plaintiff has no recourse under state or federal debt collection statutes because State Farm's civil judgment is not considered a "consumer debt."

59.     Therefore, Plaintiff's only recourse for justice is pursuant to the federal RICO Act.  *See Cisneros v. Petland, Inc.*, 2020 WL 5015283, *3 (11th Cir. 2020) ("The Supreme Court has made it clear that, although originally enacted to combat organized crime, RICO's application is not limited to conduct that is characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator, that is, of an association dedicated to the repeated commission of criminal offenses.  Rather, the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes.") (internal citation omitted) (emphasis added).

60.     Here, Defendants extort money from Plaintiff and members of the class via the improper threat of license suspension.  Extortion is a predicate act for RICO purposes. *See, e.g., Westways World Travel, Inc. v. AMR Corp.*, 265 F. App'x 472

(9th Cir. 2008) (stating that extortion is "racketeering activity" for purposes of RICO); *Robbins v. Wilkie*, 433 F.3d 755 (10th Cir. 2006) (allowing RICO claim to proceed based on alleged extortion), rev'd, 551 U.S. 537 (2007).

61.    Defendants also engage in the RICO predicate act of mail fraud by omitting from their notices and request for suspension sent to the DMV the material fact that Plaintiff and other members of the class had the required amount of insurance. Defendants omit this information because they know that there would be no valid basis for suspending their driving privileges. Defendants knowingly and intentionally omitted this information in its mailings to the DMV with the intent that the Department automatically revoke the driving privileges of the debtors and thereby forcing the debtor to take actions and pay money to have their driving privileges reinstated, when such privileges should never have been revoked in the first place. Mail fraud on the Florida Department of Motor Vehicles can be the basis of a RICO claim despite Plaintiff not relying on the misrepresentations. *See Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008).

**IV.  Class Representation Allegations**

62.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23, on behalf of herself and a Class defined as follows:

> **MAIL FRAUD AND ABUSE OF PROCESS CLASS:** All Florida judgment debtors whose driving privileges were suspended or revoked by the Department after Defendants sent a notice and/or request for suspension to the Department pursuant to Fla. Stat. §324.11 and

§324.121, and where the judgment debtor had the required amount of insurance pursuant to Fla. Stat. § 324.021(7).

**EXTORTION CLASS:**  All Florida judgment debtors who received a Collection Letter from Hiday & Ricke in connection with a motor vehicle accident which threatened to have the debtor's driving privileges revoked and where the judgment debtor had the required amount of insurance pursuant to Fla. Stat. § 324.021(7).

**Collectively the Mail Fraud and Abuse of Process Class and Extortion Class are referred to as the "Class."**

### Numerosity

63.    At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the volume of Defendants' business, there are at least hundreds of members of the Class.  Thus, the Class is so numerous that joinder of all members is impracticable.

### Commonality

64.    There is a common question of law and fact common to Plaintiff and the members of the Class including:

> A. whether Defendants constitute an "enterprise" under the RICO Act;
>
> B. whether Defendants violated the RICO Act by threatening to suspend the driving privileges of its judgment debtors as a means to extort money from them;

C.  whether Defendants violated the RICO Act by committing mail fraud against the Department of Motor Vehicles by omitting the fact that the debtor had the required minimum amount of insurance when asking for their driving privileges to be revoked; and

D.  whether Defendants committed an abuse of process by seeking to have debtors driving privileges suspended despite knowledge that the debtor had the requisite minimum amount of insurance which precludes such a suspension.

### Typicality

65.    Plaintiff's claims are typical of the claims of the Class she seeks to represent.  Plaintiff, like members of the Class, had her driving privileges suspended by the Florida DMV after notice was issued by Defendants pursuant to Fla. Stat. § 324.111, despite the fact that Plaintiff and members of the class were properly insured.  Thus, Plaintiff's claims, like the claims of the Class, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

### Adequacy

66.    Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has competent and capable attorneys who are experienced trial lawyers with

significant experience litigating complex class actions.  Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.  Neither Plaintiff nor her counsel possess interests that conflict with the Class they seek to represent.

### Injunctive Relief

67.    The Class meets the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.  Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants regarding the manner in which they request license suspensions pursuant to Fla. Stat. § 324.111.

### Prominence and Superiority

68.    The Class also meets the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Additionally, individual actions may be dispositive of the interests of members of the Class even though certain members of

the Class are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

    a. Absent a class action, as a practical matter, members of the Class will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

    b. It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

    c. A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

    d. The lawsuit presents no difficulties that would impede its management by the Court as a class action.

    e. Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate

## V.  Causes of Action

### COUNT I – VIOLATION OF THE FEDERAL RICO ACT
### (Class Claims against All Defendants)

69.    Plaintiff hereby incorporates paragraphs 1 through 68 as if fully set forth herein.

70.     Pursuant to 18 U.S.C. § 1962(a), "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity[.]"

71.     "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys' fee[.]"  18 U.S.C. § 1964(c).

72.     "A private plaintiff suing under the civil provisions of RICO must plausibly allege six elements: that the Defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff."  *Cisneros v. Petland, Inc.*, 2020 WL 5015283, *3 (11th Cir. 2020).

73.     State Farm and Hiday & Ricke operate an "enterprise" based on an agreement between the two for their shared purpose of collecting money from judgment creditors through two separate patterns of racketeering activities.

74.     Specifically, a RICO enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

22

75.    Although not a legal entity, the business agreement between State Farm and Hiday & Ricke is such that the two entities are associated in fact for the express purpose of collecting judgment debts from Florida drivers.

76.    "To plead an association-in-fact enterprise, the Supreme Court has held that a plaintiff <u>must</u> allege that a group of persons shares three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Cisneros*, 2020 WL 5015283at *4 (internal citations omitted).

77.    The shared purpose of State Farm and Hiday & Ricke's enterprise is to enrich themselves through their extortionist and fraudulent scheme of demanding payments from State Farm's properly insured judgment debtors after they are in default, or else face a suspension of their driving privileges.  State Farm and Hiday & Ricke have been associated with each other in this manner for several years.

78.    If a judgment debtor agrees to pay a lump sum amount to State Farm or agrees to a monthly payment plan, Hiday & Ricke agrees to not initiate a suspension of their driving privileges pursuant to Fla. Stat., § 324.111despite the fact that initiation of a suspension pursuant to the statute is unlawful because the debtor had the minimum amount of insurance.

79.    State Farm and Hiday & Ricke's devotion to making money from this repeated scheme to defraud and extort amongst the Class, including Plaintiff,

demonstrates the enterprise's common purpose of engaging in this reprehensible course of conduct.

80.    State Farm and Hiday & Ricke's association-in-fact relates to subrogation lawsuits and debt collection has existed for years and continues to this day in order to pursue their shared purpose in extorting State Farm's properly insured judgment debtors and by defrauding the DMV.

81.    "Beyond establishing the existence of a RICO enterprise, a plaintiff must allege that each defendant participated in the affairs of the enterprise through a pattern of racketeering activity, commonly known as a 'predicate act.'" *Cisneros*, 2020 WL 5015283 at *7.

82.    Plaintiff alleges that Defendants engaged in two separate predicate acts: (1) extortion; and (2) mail fraud.

83.    Defendant's first racketeering activity is the extortion of money from judgment creditors under the threat of license suspension by the Florida DMV despite the judgment debtors having the statutory minimum amount of insurance under Florida law.

84.    "Extortion" is one of the enumerated acts which constitutes a "racketeering activity" for RICO purposes. *See* 18 U.S.C. § 1961(1) ("[R]acketeering activity" means (A) any act or threat involving . . . extortion . . .

which is chargeable under State law and punishable by imprisonment for more than one year[.]").

85.    Under Florida law, "[w]however, either verbally or by a written or printed communication, . . . threatens an injury to the person, property or reputation of another . . . with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will, shall be guilty of a felony of a second degree[.]" Fla. Stat. § 836.05,

86.    Plaintiff received a "warning letter" addressed to her which threatened to have her driving privileges suspended if she did not call Hiday & Ricke regarding their "unpaid claim" for the purpose of extorting money from Plaintiff under a threat of having her license suspended.

87.    When Plaintiff could not afford to pay, Hiday & Ricke initiated the improper and illegal suspension of Plaintiff's driving privileges pursuant to Fla. Stat. § 324.111 by sending notice of the default to the DMV despite knowing such act was baseless because she had the minimum amount of insurance required by Florida law.  In that request, Defendants omitted the material fact that Plaintiff had the minimum amount of insurance at the time of the accident.

88.    Plaintiff was damaged in her property in that her driver's license and driving privileges were suspended by the State of Florida as a direct result of Hiday

& Ricke's notice of default filing which failed to inform the Department that she had the required amount of insurance. Defendants knowingly kept that fact from the Department with knowledge that her driving privileges would be automatically suspended and that Plaintiff and other class members would suffer injury by having their driver's license and their driving privileges revoked and then having to tender proof of insurance at some later date to have their license reinstated. This tactic is classic extortion.

89. Despite full knowledge that there is no valid basis for requesting a suspension of driving privileges, Hiday & Ricke—a law firm— repeatedly request suspensions with knowledge that the debtor had the minimum amount of insurance and with knowledge that no suspension should issue under such circumstances.

90. These predicate acts constitute extortion pursuant to Fla. Stat. § 836.05 and therefore meets the definition of a "racketeering activity" pursuant to 18 U.S.C. §1961(1)(A), including "extortion."

91. Defendant's second predicate act in violation of RICO is "mail fraud" pursuant to 18 U.S.C. §1341. Mail fraud "occurs whenever a person, having devised or intending to devise any scheme or artifice to defraud uses the mail for the purpose of executing such scheme or artifice or attempting to do so. *See*, 18 U.S.C. § 1341.

92. By purposely omitting from the suspension requests sent to the DMV the material fact that Plaintiff and other debtors had the minimum amount of

26

insurance required by Florida law, Defendants intended to deceive the Florida DMV and to cause Plaintiff and others to have their driving privileges improperly revoked. This omitted information would have resulted in the DMV not revoking the driving privileges of particular debtors and the request for suspension would have been denied.

93.    Defendants have made hundreds if not thousands of requests to have the driving privileges of State Farm judgment debtors revoked without a valid legal basis to make such requests because the debtor had the requisite insurance. Defendants make such fraudulent requests because debtors will pay more to have their driving privileges reinstated or not revoked.  Unless the debtor knows Florida law and promptly advises the Court that they were properly insured, the license can be suspended unless and until the debtor agrees to pay Defendants.  This scheme would not be possible but for the deliberate omission of material information from the suspension requests made by Defendants to the DMV.

94.    Defendants' series of predicate acts extended over a substantial period of time and the threat of continuity exists for both Plaintiff and the Class.  Hiday & Ricke are debt collectors familiar to Legal Aid and other organizations that represent low income consumers and these tactics have been used for years.

95.    Defendants' blatant disregard for the law and extortionist scheme provides a substantial part of Defendants' enterprise and regular way of doing

business; their illegal acts will continue to be repeated in the future if not stopped by order of this Court.

96.    Defendants' act of initiating the suspension of driving privileges of Plaintiff and the Class is the direct cause of their driving privileges being actually revoked by the DMV without legal justification.  Even if only for a short time, Plaintiff and the Class suffered damage in having their right to drive improperly taken from them through the fraudulent conduct of Defendants.

97.    Drivers' licenses are  protected property interests  under  the  United States Constitution.  *See Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430–31, 102 S.Ct.  1148,  71  L.Ed.2d  265  (1982) (listing drivers'  licenses as  federally protected property interests); *Mackey v. Montrym,* 443 U.S. 1, 10, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (stating suspension of a drivers license for statutorily defined cause implicates a protectible property interest); *Dixon v. Love,* 431 U.S. 105, 112, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (stating [i]t is clear that the Due Process Clause applies to the deprivation of a drivers' license by the State).

98.    The suspension of Plaintiff's and the Class' driving privileges caused injury to the property of Plaintiff and the Class, as follows:

a.    loss of their drivers' licenses and driving privileges; and

b.    the costs associated with the loss of their drivers' licenses, including but not limited to, the cost to reinstate their driving privileges,

the loss of employment, costs of transportation, costs associated with criminal charges, if any, as a result of driving on a suspended license.

99.    By reason of the damages directly sustained by Plaintiff from the injuries to her property, she is entitled to treble her direct actual damages and collect her reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).  Plaintiff also seeks nominal damages along with a declaration that Defendant's conduct is unlawful and should be stopped.

## COUNT II—ABUSE OF PROCESS
### (Class Claims against All Defendants)

100.    Plaintiff hereby incorporate by reference paragraphs 1 through 68, as if set forth in this Count.

101.    Under Florida law, "[a] cause of action for abuse of process contains three elements: (1) that the defendant made an illegal, improper, or perverted use of process; (2) that the defendant had ulterior motives or purposes in exercising such illegal, improper, or perverted use of process; and (3) that, as a result of such action on the part of the defendant, the plaintiff suffered damage."  *S & I Investments v. Payless Flea Market, Inc*., 36 So. 3d 909, 917 (Fla. 4th DCA 2010).

102.    In order to further the shared purpose of Defendants' collection of amounts due from judgment debtors, Hiday & Ricke, under the direction and control of State Farm, initiated the suspension of Plaintiff's driver's license with the DMV pursuant to Fla. Stat. § 324.111.

29

103.    The initiation of the suspension of the drivers' licenses of Plaintiff and the class was illegal and improper because Plaintiff and members of the class were properly insured pursuant to the 10/20/10 minimum required limits.

104.    The Defendants' improper ulterior motive or purpose in exercising the illegal and improper use of the administrative functions of the DMV was to put pressure on Plaintiff and the Class to pay money on their judgment debt for Defendants' own pecuniary gain.

105.    As a result of Defendants' abuse of process, Plaintiff and the class had their drivers' licenses wrongfully suspended.

106.    Thus, Defendants are liable for abuse of process because their use of the DMV to suspend the driving privileges of Plaintiff and the class was not justified pursuant to § 324.111; rather, Defendants knowingly abused the "process" of requesting revocation of drivers' licenses for the purpose of extorting Plaintiff and the class for Defendants' own pecuniary gains. *See S & I Investments*, 36 So. 3d at 917.

107.    The suspension of Plaintiff's driver's license caused injury to the property of Plaintiff as follows:

a.    loss of her driver's license and driving privileges; and

b.    the costs associated with the loss of her driver's license, including but not limited to the cost to reinstate her license, loss of employment, costs of transportation, costs associated with criminal charges, if any, as a result of driving on a suspended license.

30

108.   Under Florida law, a plaintiff is entitled to recover "special damages" in an action for abuse of process.  *See Bothmann v. Harrington*, 458 So. 2d 1163, 1170 (Fla. 3d DCA 1984).

109.   The "special damages" recoverable is the pecuniary loss resulting directly and immediately from the tort and the expenses incurred to counteract such abuse of process.  *Id.*

110.   In addition, punitive damages are also recoverable in an abuse of process action where a plaintiff establishes actual malice.  *Id.* at 1171.

111.   "Malice" as defined under Florida law means "intentionally" and "without lawful justification."  *O'Flaherty-Lewis v. State*, 230 So. 3d 15 (Fla. 4th DCA 2017).

112.   Defendants intentionally initiated the suspension of Plaintiff's and other class members' drivers' licenses because they knew they were without lawful justification to do so since they had the requisite minimum insurance and they refused to reinstate Plaintiff's license after being provided ample proof and opportunity to do so.   Accordingly, Plaintiff is entitled to punitive damages for Defendants' actual malice in perpetrating the abuse of process.

113.   By reason of the damages directly sustained by Plaintiff from the injuries to her property, she is entitled to special and punitive damages resulting from Defendants' acts, as well as an award of court costs.

31

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:  APRIL 7, 2021

VARNELL & WARWICK, P.A.

BY:    /s/ Brian W. Warwick
        BRIAN W. WARWICK; FBN:  0605573
        JANET R. VARNELL; FBN:  0071072
        MATTHEW T. PETERSON; FBN: 1020720
        ERIKA R. WILLIS; FBN:  100021
        1101 E. CUMBERLAND AVE.
        STE. 201H, #105
        TAMPA, FL  33602
        TELEPHONE:  (352) 753-8600
        FACSIMILE:  (352) 504-3301
        *bwarwick@vandwlaw.com*
        *jvarnell@vandwlaw.com*
        *mpeterson@vandwlaw.com*
        *ewillis@vandwlaw.com*
        *kstroly@vandwlaw.com*

        SMITH BIGMAN BROCK, P.A.

        By:/s/ Adam J. Campbell
        Adam J. Campbell; FBN: 0123509
        444 Seabreeze Boulevard, Suite 900
        Daytona Beach, Florida 32118
        Telephone: (386) 254-6875
        Fax:  (386) 257-1834
        acampbell@daytonalaw.com